UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.

CASE NO. 6:26-cr-00104-RBD-RMN

18 U.S.C. § 371

ALAN FARINA

## INFORMATION

The United States Attorney charges:

**(Conspiracy to Defraud the United States and to Purchase, Sell, and Distribute Medicare Beneficiary Identification Numbers)**

### A.    Introduction

At all times material to this Information:

The Defendant and Related Parties

1.      Defendant Alan Farina ("FARINA") was a resident of Chuluota in Seminole County, Florida. FARINA was the owner and CEO of One Life Health Source LLC ("One Life") and the owner, manager, and President of Quantum Care Management LLC ("Quantum Care").

2.      One Life was a Florida company located in Altamonte Springs in Seminole County, Florida.

3.      Quantum Care was a Florida company located in Altamonte Springs in Seminole County, Florida.

The Medicare Program

4.      The Medicare program ("Medicare") was a federal health care program

that provided medical benefits, items, and services to individuals:

    a.  age 65 or older,

    b.  under age 65 with certain disabilities, and

    c.  of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

5.     Individuals who received Medicare benefits were referred to as "beneficiaries."

6.     The Centers for Medicare and Medicaid Services ("CMS") was an agency of the U.S. Department of Health and Human Services ("HHS") and was the federal governmental body responsible for the administration of Medicare.

7.     Medicare included coverage under component parts. Medicare Part A was a hospital insurance program that covered beneficiaries for, among other types of care, inpatient care in hospitals and other facilities. Medicare Part B was a medical insurance program that covered doctors' services, outpatient care, diagnostic testing, durable medical equipment, and other medical items and services not covered under Medicare Part A.

8.     Laboratories, pharmacies, physicians, nurse practitioners, and other health care providers that furnished items and services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit a Medicare enrollment application, which required providers to certify that they would abide by Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

9. Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. To receive payment from Medicare, providers submitted or caused the submission of claims to CMS that were required to set forth, among other information, the Medicare beneficiary's name and unique Medicare beneficiary identification number, the item or service provided to the beneficiary, the date the item or service was provided, and the cost of the item or service.

10. Medicare would not reimburse providers for claims for items or services that were procured in violation of the Federal Anti-Kickback Statute, including the provision prohibiting the purchase, sale, and distribution of Medicare beneficiary identification numbers.

Medicare Advantage Plans

11. Medicare Part C, also known as "Medicare Advantage," provided Medicare beneficiaries with the option to receive their Medicare benefits through private managed health care plans ("Medicare Advantage Plans"), including health maintenance organizations and preferred provider organizations. To be eligible to enroll in a Medicare Advantage Plan, an individual had to have been entitled to receive benefits under Medicare Part A and Part B. To receive Medicare Advantage benefits, a beneficiary was required to enroll in a managed care plan operated by a private company approved by Medicare.

12. Rather than reimbursing based on the extent of the services provided, as CMS did for providers enrolled in original fee-for-service Medicare, CMS made

3

fixed, monthly payments to a plan sponsor for each Medicare beneficiary enrolled in one of the sponsor's plans, regardless of the services rendered to the beneficiary that month or the cost of covering the beneficiary's health benefits that month. The private health insurance companies then reimbursed the provider based on the services that were purportedly provided.

13. Private health insurance companies offering Medicare Advantage Plans were required to provide beneficiaries with the same items and services offered under Medicare Part A and Part B. Medicare Advantage Plans covered DME and related health care benefits, items, and services. Among its responsibilities, these Medicare Advantage plans received, adjudicated, and paid the claims of authorized providers seeking reimbursements for the cost of DME and related health care benefits, items, or services supplied to Medicare beneficiaries.

Medicare Beneficiary Identification Numbers

14. Each Medicare beneficiary was identified with a unique beneficiary identification number. These beneficiary identification numbers were used to determine a beneficiary's eligibility for Medicare benefits and to submit claims to Medicare seeking reimbursement for covered benefits, items, and services. Health Insurance Claim Numbers ("HICNs") and Medicare Beneficiary Identifiers ("MBIs") were two types of Medicare beneficiary identification numbers.

15. HICNs were typically comprised of the beneficiary's social security number and often included one or more additional letters. In 2015, Congress passed the Medicare Access and CHIP Reauthorization Act ("MACRA"), which mandated

4

that CMS phase out the use of social security numbers in the assignment of Medicare beneficiary identification numbers.

16.     Following the passage of MACRA, CMS began to assign Medicare beneficiaries MBIs, which were comprised of a unique series of eleven randomly generated numbers and letters. MBIs, like HICNs, were used to identify qualifying beneficiaries in all Medicare transactions such as billing and claim submissions. One purpose of using this randomly generated series of numbers and letters was to improve patient identity protection and prevent identify theft.

Over-the-Counter COVID-19 Tests

17.     Starting on April 4, 2022, and continuing through the end of the COVID-19 public health emergency, Medicare covered and paid for over-the-counter COVID-19 tests at no cost to beneficiaries with Medicare Part B, including those with Medicare Advantage plans. Eligible providers capable of providing ambulatory health care services were permitted to distribute to Medicare beneficiaries over-the-counter COVID-19 tests that were approved, authorized, or cleared by the United States Food and Drug Administration.

18.     Medicare would not pay for more than eight over-the-counter COVID-19 tests per calendar month per Medicare beneficiary. Providers could distribute over-the-counter COVID-19 tests to Medicare beneficiaries who requested them and were required to keep documentation showing a Medicare beneficiary's request for the tests.

19. Medicare did not cover over-the-counter COVID-19 tests billed by durable medical equipment suppliers or providers who distributed over-the-counter COVID-19 tests to Medicare beneficiaries during an inpatient stay at a hospital or skilled nursing facility.

### B. The Conspiracy

20. From in or around May 2022 through in or around June 2022 and in or around March 2023 through in or around April 2023, in the Middle District of Florida and elsewhere, the defendant,

### ALAN FARINA,

did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the United States Attorney to:

 a. defraud the United States by cheating the United States government and any of its departments and agencies out of money and property, and by impairing, impeding, obstructing, and defeating, through deceitful and dishonest means, the lawful government functions of HHS and CMS in their administration and oversight of Medicare; and

 b. purchase, sell, and distribute, and arrange for the purchase, sale, and distribution, of Medicare beneficiary identification numbers, that is, HICNs and MBIs, in violation of 42 U.S.C. § 1320a-7b(b)(4).

### C. Purpose of the Conspiracy

21. It was a purpose of the conspiracy for FARINA and others to unlawfully enrich themselves by, among other things: (a) purchasing, selling, and distributing, and arranging for the purchase, sale, and distribution, of Medicare beneficiary information, including MBIs; (b) submitting and causing the submission

of false and fraudulent claims to Medicare for over-the-counter COVID-19 tests that were ineligible for Medicare reimbursement; and (c) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### D.    Manner and Means

22.    The manner and means by which the defendant and his co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

a.    It was part of the conspiracy that FARINA did own and operate One Life and Quantum Health.

b.    It was further part of the conspiracy that FARINA paid marketing companies and purported telemedicine companies at least approximately $896,059 in exchange for Medicare beneficiary identification numbers and other information for Medicare beneficiaries throughout the United States.

c.    It was further part of the conspiracy that FARINA sent the Medicare beneficiary identification numbers and other information to a Medicare provider in exchange for a portion of any reimbursement from claims billed by the Medicare provider using that information.

d.    It was further part of the conspiracy that FARINA and his co-conspirators would cause over-the-counter COVID-19 tests to be shipped to those Medicare beneficiaries whose Medicare beneficiary identification numbers had been purchased, regardless of whether the Medicare beneficiaries had wanted and/or requested the tests.

e.      It was further part of the conspiracy that FARINA and his co-conspirators caused the submission of millions of dollars of false and fraudulent claims to Medicare for over-the-counter COVID-19 tests that were ineligible for reimbursement. Medicare paid approximately $2,712,228.74 based on those claims.

f.      It was further part of the conspiracy that FARINA received the majority of the Medicare reimbursement payments and that FARINA transferred to one of his co-conspirators the majority of those proceeds while retaining a portion of the Medicare reimbursement payments for his own use.

### E.      Overt Acts

23.     The defendant and his co-conspirators committed various overt acts in furtherance of the conspiracy, and to effect the objects thereof, in the Middle District of Florida and elsewhere. In furtherance of the conspiracy, and to accomplish its object and purpose, at least one co-conspirator committed and caused to be committed, in the Middle District of Florida, at least one of the following overt acts, among others:

a.      On or about June 22, 2022, a co-conspirator at a Medicare provider transmitted a wire payment to FARINA in the amount of approximately $200,000 in exchange for Medicare beneficiary information.

b.      On or about June 23, 2022, FARINA sent or caused to be sent a wire payment to a marketing company in the amount of approximately $50,000 in exchange for Medicare beneficiary information.

c.      On or about April 3, 2023, a co-conspirator at a Medicare

8

provider transmitted a wire payment to FARINA in the amount of approximately $499,000 in exchange for Medicare beneficiary information.

   d.  On or about April 3, 2023, FARINA sent or caused to be sent a wire payment to a purported telemedicine company in the amount of approximately $107,240 in exchange for Medicare beneficiary information.

   e.  On or about April 19, 2023, a co-conspirator at a Medicare provider transmitted a wire payment to FARINA in the amount of approximately $499,999 in exchange for Medicare beneficiary information

   f.  On or about April 21, 2023, FARINA sent or caused to be sent an international wire payment to a marketing company in the amount of approximately $112,000 in exchange for Medicare beneficiary information.

  All in violation of 18 U.S.C. § 371.

## FORFEITURE

1.  The allegations contained in this Information are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 982(a)(7).

2.  Upon conviction of the federal health care offense charged in this Information, the defendant,

**ALAN FARINA,**

shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such violation.

9

3.      The property to be forfeited includes, but is not limited to, a

$421,282.29 order of forfeiture, which represents the proceeds of the offense.

4.      If any of the property described above, as a result of any act or omission

of the defendant:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be
divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property

pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

GREGORY W. KEHOE
United States Attorney

By:_____
Diane Hu
Assistant United States Attorney

LORINDA LARYEA
Acting Chief
Criminal Division, Fraud Section

By: _____
for Catherine E. Wagner
Acting Assistant Chief

10